## A00A1184. BROWN v. THE STATE.
### (539 SE2d 545)

POPE, Presiding Judge.

Johnny Mack Brown was tried for aggravated assault with intent to murder, hijacking a motor vehicle, two counts of armed robbery and two counts of aggravated assault. He was convicted of armed robbery, two counts of aggravated assault, aggravated battery, hijacking a motor vehicle and the lesser offense of theft by taking; he was acquitted of one count of aggravated assault. He appeals, raising four enumerations of error. For the following reasons, we vacate one conviction of aggravated assault; we affirm the remainder of the judgment.

Evidence at trial showed that around 11:00 a.m. on December 22, 1997, Brown shot Ricky Eberhardt, who was a courier guard, in the parking lot of a large shopping center. Brown came up behind Eberhardt as he was loading a money deposit into the armored truck. Without saying a word, Brown shot Eberhardt three times with a .45 caliber semi-automatic handgun. Two shots hit Eberhardt in the back of his body, while the third struck him in the front. Eberhardt fell to the ground next to the armored vehicle, and Brown grabbed the moneybag, which contained more than $146,000, and ran across the busy parking lot. James Pearce, Eberhardt's co-worker, who was inside the armored vehicle, came out of it when he heard the shots. He followed Brown across the parking lot. Officer Bobby Tribble, an off-duty instructor at the Northeast Georgia Police Academy, was inside the Wal-Mart store and also heard the gunshots. He went outside and saw Brown holding a large canvas bag in one hand and a weapon in the other.

---

[7] *Carey v. W. R. Grace & Co.,* 221 Ga. App. 728, 730 (3) (a) (472 SE2d 524) (1996).

Both Tribble and Pearce followed Brown toward the exit of the shopping center. In front of the Upton's store, Brown confronted Raymond Davenport, who was waiting in his car for his wife. Brown pointed his weapon at Davenport and stated several times that he wanted the car.

At about this time, Pearce (the co-worker of wounded Eberhardt) saw a police car and fired his revolver in the air to alert the police to Brown's location. Brown then turned and pointed his gun in Pearce and Tribble's direction. Brown opened fire on the two, and, as Tribble ducked behind the tire of a vehicle, Brown impaled the tire with a shot. Tribble then pulled his gun and returned fire. He fired three shots, grazing Brown once and striking Davenport's vehicle twice.

Although Davenport was in his vehicle when the shooting began, he jumped out of his car when he heard the shots. Brown then jumped into Davenport's car with his gun and the money and headed to the exit. Brown left behind his car which was parked back-end first in the parking lot of an adjoining restaurant. Brown then drove across the highway to Georgia Square Mall where he was apprehended in the common area. A police officer told Brown to stop several times at which point Brown raised his hands and eventually, as instructed, lay down on the ground. When apprehended, Brown was carrying a pistol and plastic pouches containing the stolen money.

After his arrest and after being read his rights, Brown confessed to all of the acts; he stated that he committed the crimes because he was trying to be killed by a police officer. He gave a statement to the police in which he explained that he had wanted to kill himself the night before, but had been unable to do so. Accordingly, Brown had gone to the mall with the specific purpose of doing something that would prompt a law enforcement officer to shoot him. He stated that he assumed that Eberhardt was wearing a bulletproof vest and he tried to shoot him where he would be protected by the vest.

In September 1998, about nine months after committing the crimes outlined above, Brown escaped from jail. Brown was picked up by the police in November 1998, in Florida.

At trial, Brown presented an insanity defense. In this regard, he presented the testimony of a psychologist who testified that Brown was suffering from severe recurrent depression and a borderline personality. Nevertheless, this expert also testified that, in his opinion, Brown could distinguish right from wrong at the time of the crimes and that he was not acting under a delusional compulsion. Furthermore, testimony from the two mental health experts called by the State and by the court was also that Brown could distinguish right from wrong at the time of the crimes and that he was not acting under a delusional compulsion which, if true, would have justified his acts.

1. Brown argues that the court erred by failing to merge the conviction and sentence for aggravated assault with intent to murder with the aggravated battery.[1] Citing *Lowe v. State*, 267 Ga. 410, 411 (1) (478 SE2d 762) (1996), Brown contends that the act which formed the basis for these crimes was the same: the shooting of Eberhardt. He argues that he committed one continuous act and that therefore there was a factual merger.

The State, citing *Grace v. State*, 262 Ga. 746, 747-748 (2) (425 SE2d 865) (1993), argues that the crimes do not merge. The State argues that the shots which formed the basis of the aggravated battery were those to Eberhardt's elbow and to his left back and spine; these shots caused Eberhardt to lose use of his arm and some use of his legs. The State contends that the assault with intent to murder was based on the third shot which Brown fired which struck Eberhardt's bulletproof vest, resulting in a welt and a mark.

Evidence at trial was that Brown shot Eberhardt three times in quick succession. With regard to the gunshots, Eberhardt testified: "[t]o me the duration was pretty much like bam, bam, bam." Eberhardt dropped his moneybag and fell to the ground. Eberhardt's coworker stated: "I heard something like a fire pop, and I seen Rick turn around and looking. And I'm like Rick, you okay. You okay. And then I heard rapid fire pop, pop like that. Then I heard him saying Oh, Lord, have mercy." In Brown's statement in which he confessed the crime, he stated that he did not know how many times he shot Eberhardt.

The issue of whether the firing of multiple gunshots may serve as the basis for separate charges has been addressed several times. In *Lowe v. State*, 267 Ga. 410, the defendant was charged with various crimes including malice murder and aggravated assault. The evidence showed that Lowe fired one shot which struck the victim in the arm and caused him to fall. Lowe then walked over to the victim and stood above him while he pled for his life. He then fired a second shot

---

[1] Count 2 of the indictment charges Brown with aggravated assault with intent to murder, stating that Brown "did unlawfully make an assault upon the person of Ricky Eberhardt with intent to murder by shooting him" with a semi-automatic pistol. Count 3 accuses Brown of aggravated battery, charging that Brown "did maliciously cause bodily harm to Rick Eberhardt by depriving him of a member of his body by shooting Ricky Eberhardt" with a semi-automatic pistol. Assault is defined in OCGA § 16-5-20, and the provisions under which an assault becomes an aggravated assault, including intent to murder, are set forth in OCGA § 16-5-21 (a). An aggravated assault is defined as an assault with the intent to murder. OCGA § 16-5-24 provides the definition for aggravated battery, stating:

[a] person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof.

Brown does not argue that there was a legal merger.

which struck the victim in the abdomen and killed him. Id. at 411 (1).

Lowe argued that the aggravated assault merged into malice murder as a matter of fact. Our Supreme Court rejected his argument, concluding that the separate convictions and sentences were authorized because Lowe committed the aggravated assault independently of the act which caused the victim's death. Because the aggravated assault was proven by evidence that was not used to prove the murder itself and because the aggravated assault was completed before the murder was committed, the court concluded that the crimes did not merge. *Lowe v. State,* 267 Ga. at 412 (1) (b). "If, however, the murder itself resulted from the single act of firing a series of shots in quick succession at the victim, no aggravated assault independent of the murder would be shown." (Citations and punctuation omitted.) Id.

Similarly, in *Grace v. State,* 262 Ga. at 747-748 (2), our Supreme Court concluded that the evidence established that the defendant had committed both an aggravated assault and an aggravated battery of Warren Jackson during an armed robbery. In *Grace,* the evidence showed that Jackson, the cash register operator, was shot between his eyes after ringing up a sale. The force of the gunshot knocked Jackson to the floor where he heard his co-worker plead for his life and then heard a second gunshot. Jackson was then shot a second time. Id. The State argued that the aggravated battery was established by evidence of the first shot, which blinded Jackson in one eye, and that the second shot constituted an aggravated assault. The court agreed, concluding that "[t]he evidence used to prove the commission of the aggravated assault was not used at all in proving the commission of the aggravated battery." Id. at 748 (2).

On the other hand, in *Montes v. State,* 262 Ga. 473, 474-475 (1) (421 SE2d 710) (1992), our Supreme Court concluded that the evidence failed to show that the defendant had perpetrated both an aggravated assault and a malice murder of the deceased victim. In *Montes,* the evidence showed that using a semi-automatic weapon, the defendant had fired a number of shots that had struck several victims. One of the victims had been struck by three bullets; defendant was convicted of malice murder for the infliction of the fatal wound, and for aggravated assault for the infliction of the two nonfatal wounds. Id. at 474, n. 3.

Applying the "actual evidence" test of the substantive double jeopardy provisions, OCGA §§ 16-1-6 and 16-1-7 (a), the *Montes* court concluded that the evidence used to prove the aggravated assault — that the defendant fired a deadly weapon and wounded the deceased victim — was also used to prove that defendant had committed malice murder. Accordingly, the court set aside the conviction and sentence for the aggravated assault. In doing so, the court stated: "[w]e

take this opportunity to disapprove the language in *Pryor v. State*, 238 Ga. 698 (1) (234 SE2d 918) (1977), that each of a series of shots fired in quick succession constitutes a 'renewed assault.' " Id. at 474-475 (1).

A review of the cases concerning factual merger when multiple gunshots are fired illustrates the complexity of this issue. As with any factual merger question, the dispositive issue is whether the State "used up" its evidence in proving the crime: "The 'actual evidence' test, in effect, means that if the state uses up all the evidence that the defendant committed one crime in establishing another crime, the former crime is included in the latter as a matter of fact under OCGA § 16-1-6 (1)." (Citations and punctuation omitted.) *Montes v. State*, 262 Ga. at 474 (1). Contrary to the State's argument here, the question is not whether medically distinguishable injuries were inflicted; the question is whether the State proved two completed crimes. See, e.g., *Fitzpatrick v. State*, 268 Ga. 423 (1) (489 SE2d 840) (1997) (evidence used to prove that defendant committed an aggravated assault by cutting and stabbing the decedent more than 12 times was the same as that used to prove that he committed the malice murder and the crimes merged); *Davis v. State*, 186 Ga. App. 491 (367 SE2d 884) (1988) (two charges of aggravated assault were part of a single transaction when shots fired within sixty seconds and no evidence that assault with the pistol was complete). Compare *Drane v. State*, 265 Ga. 255, 260 (9) (455 SE2d 27) (1995) (aggravated battery did not merge with malice murder where victim's throat was slashed at least six times after she was shot in the head and a rational trier of fact could have found defendant guilty of aggravated battery independent of the act causing the victim's death); *Wright v. State*, 243 Ga. App. 167 (532 SE2d 724) (2000) (no factual merger where the evidence showed that defendant stabbed his wife twenty-six times because the two acts which disfigured the victim's arm and heart supported the conviction for the aggravated battery while the remaining twenty-four acts supported the conviction for aggravated assault); *Welch v. State*, 216 Ga. App. 256 (454 SE2d 566) (1995) (evidence supported two aggravated assault convictions where defendant engaged in two assaults punctuated by several minutes in which defendant fired no shots and jury could find that first assault was completed before defendant resumed shooting).

In this case the evidence showed only that Brown's actions were the result of a "single act of firing a series of shots in quick succession at the victim," *Lowe v. State*, 267 Ga. at 412 (1) (b), and thus that the aggravated assault merged into the aggravated battery. Furthermore, the indictment in this case alleged only one act: the shooting of Eberhardt. Count 2 alleged that Brown unlawfully assaulted Eberhardt with the intent to murder by shooting him with a semi-

automatic pistol; Count 3 accuses Brown of aggravated battery, charging that Brown "did maliciously cause bodily harm to Rick Eberhardt by depriving him of a member of his body by shooting Ricky Eberhardt" with a semi-automatic pistol. Because the evidence used to prove Count 2 of the indictment was also used to prove Count 3, the conviction and sentence for the aggravated assault of Eberhardt should be set aside.

2. Next Brown claims that the court below erred in denying his motion to strike for cause prospective juror Keith Hill. We disagree.

> Before a juror can be disqualified for cause, it must be shown that an opinion held by the potential juror is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence. [Cits.]

*Johnson v. State*, 262 Ga. 652, 653 (2) (424 SE2d 271) (1993). See generally OCGA § 15-12-164. And, unless the trial court manifestly abuses its discretion in deciding whether or not to discharge a prospective juror, this court will not reverse the trial court's decision. *Harris v. State*, 178 Ga. App. 735, 736 (344 SE2d 528) (1986).

During voir dire, juror Hill indicated that he had seen newspaper articles regarding the case. He also indicated that he worked at the same Dupont plant with Eberhardt's brother, although at the time of trial they were working different shifts. Hill also stated that he knew Eberhardt, as an acquaintance. Hill stated that he knew the district attorney because of his job as a groundskeeper at Athens Country Club. Nevertheless, Hill stated without hesitation that he would be able to judge the case solely on the evidence presented, and he gave no indication that he would be prejudiced against Brown. "When ruling on a potential juror's qualifications, the trial court must make a factual determination based on all the circumstances known to the court, including, but not limited to, the juror's own opinion of his impartiality." *Lively v. State*, 262 Ga. 510, 511 (1) (421 SE2d 528) (1992).

In this case, the record as a whole shows no abuse of the trial court's discretion in its failure to remove Hill for cause. See *Fuller v. State*, 230 Ga. App. 219 (1) (496 SE2d 303) (1998).

3. Brown argues that the court erred in denying his pre-trial motion for change of venue because the extensive newspaper and radio coverage and the nature of the offenses created an inherently prejudicial environment.

> A motion for change of venue based upon excessive pretrial publicity invokes the trial court's discretion, and its ruling

will not be disturbed absent an abuse of that discretion. As the movant, [Brown] had the burden of showing (1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible.

(Citations and punctuation omitted.) *Dixson v. State*, 269 Ga. 898 (2) (506 SE2d 128) (1998).

Brown does not argue that actual prejudice resulted from the jury selection process; he contends that inherent prejudice arose from pre-trial publicity. He does not specifically argue here how that inherent prejudice manifested itself. In any case, we have considered the various factors regarding whether inherent prejudice existed, see, e.g., *Chancey v. State*, 256 Ga. 415, 429 (5) (349 SE2d 717) (1986), and find nothing in the record to indicate that the trial court abused its discretion in denying the motion. Moreover, in denying the motion, the trial court noted that 20 of the 25 articles submitted by Brown with his motion to change venue dealt with his escape. Importantly, the court noted: "Defense Counsel admits that there probably would not have been a Motion for Change of Venue without the additional media coverage from the alleged escape." In *Goodman v. State*, 255 Ga. 226, 230 (14) (336 SE2d 757) (1985), the court stated:

we observe that courts will generally be less likely to closely scrutinize the prejudicial effect of publicity upon a defendant's trial in cases where that publicity is created by the defendant's escape attempt than in cases where the publicity stems from other sources.

For the additional reasons set forth in *Goodman*, we reject Brown's contentions.

4. Finally, Brown contends that the evidence showed that he was insane at the time of the crimes and that the guilty verdicts are insupportable.

The defendant may be found "not guilty by reason of insanity at the time of the crime" if he meets the criteria of Code Section 16-3-2 (lacked mental capacity to distinguish between right and wrong in relation to the crime) or 16-3-3 (acted because of a delusional compulsion which overmastered defendant's will to resist committing the crime) at the time of the commission of the crime. OCGA § 17-7-131 (c) (1). The appropriate standard of appellate review . . . is whether the evidence, when construed most favorably for the State, would be sufficient to authorize a rational trier of fact to find that appellant failed to prove by a preponderance

of the evidence that [he] was insane at the time of the (crimes). [Cits.]

*Rodriguez v. State*, 271 Ga. 40, 42 (1) (518 SE2d 131) (1999).

While there was expert evidence from three mental health professionals that Brown suffered from a severe recurrent depression and borderline personality, there was also expert evidence that Brown was able to differentiate between right and wrong, that he was not suffering any delusions that would have justified his acts, and that he was not legally insane at the time of the crimes. We conclude that the evidence was sufficient to support the jury's finding that Brown was not legally insane at the time of his crimes. Furthermore, we find that a rational trier of fact could find from the evidence adduced at trial proof of Brown's guilt of the crimes beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed in part and vacated in part. Miller and Mikell, JJ., concur.*

· DECIDED SEPTEMBER 19, 2000.

*Thomas J. Killeen*, for appellant.

*Harry N. Gordon, District Attorney, Michael E. Eberhardt, Assistant District Attorney*, for appellee.